UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SEAN SILVERNAGEL, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 3:22-cv-01013 |
| PATHGROUP HOLDINGS, LLC, | ) Judge Aleta A. Trauger |
| ASSOCIATED PATHOLOGISTS II, P.C., | ) |
| BEN DAVIS, M.D., DERRICK WELCH, and | ) |
| JOHN DOES 1–5, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

Defendants PathGroup Holdings, LLC ("PathGroup"), Associated Pathologists II, P.C. ("APII"), Ben Davis, and Derrick Welch have filed a Motion to Compel Arbitration and to Dismiss, or in the Alternative, to Stay Proceedings (Doc. No. 17), to which plaintiff Sean Silvernagel has filed a Response (Doc. No. 25), and the defendants have filed a Reply (Doc. No. 28). Three other motions are pending: the defendants' Motion to Dismiss Plaintiff's First Amended Complaint (Doc. No. 31); Silvernagel's Motion to Amend Complaint (Doc. No. 36); and Silvernagel's Unopposed Motion for Leave to file Excess Pages (Doc. No. 37). For the reasons set out herein, the court will compel arbitration, dismiss Silvernagel's claims without prejudice, and deny the other motions as moot.

## I. BACKGROUND

Silvernagel, Davis, and Welch are business associates. In 2016, they formed PathGroup as a Delaware LLC. PathGroup's affairs were governed by an Amended & Restated Limited Liability Company Agreement dated August 1, 2016, and amended in 2018 (collectively, the

"LLC Agreement"). (Doc. Nos. 18-1, 18-2.) Pursuant to the LLC Agreement, ownership of the company was divided into formal "Units" owned by "Members," including identified "Management Investors" who operated the company. (Doc. No. 18-1 at 5, 8.) The LLC Agreement acknowledged that the underlying venture would involve both PathGroup, which it referred to as the "Company," and APII, which was designated as the "Operating Company" and included in the "Company Group." (*Id.* at 3, 6.)

The LLC Agreement provides that, "after the termination of a Management Investor's employment or engagement with the Company Group for any reason, the Company shall have the right (but not the obligation) to repurchase all or any portion of the Units issued to such Management Investor." (Doc. No. 18-1 at 32; Doc. No. 18-2 at 33.) The purchase price for any such buyback, however, depends on whether the "Management Investor's employment or engagement [was] terminated for Cause"—with full fair market value available only in the event of termination without cause. (*Id.*) The LLC Agreement provides that, if a terminated Management Investor has a separate agreement defining for-cause termination—such as an individual employment contract—then that definition will control for the purposes of the LLC Agreement as well. For instances in which there is no such separate contract, the LLC Agreement provides a lengthy default definition of "Cause." (Doc. No. 18-1 at 2; Doc. No. 18-2 at 2.)

Silvernagel was a Management Investor in PathGroup and had a preexisting employment contract with APII. Eventually, however, Silvernagel had a falling out with Davis and Welch, who decided to terminate his employment and buy back his units. There does not appear to be any dispute—at least before this court—regarding the fact that the defendants had a general right to force Silvernagel out of the venture and repurchase his Units. The parties disagree, however,

regarding whether the defendants had the right to terminate Silvernagel for cause and, by extension, how much money he will be owed in connection with any buyback.[1]

On December 13, 2022, Silvernagel filed a Complaint in this court setting out various causes of action against the defendants, including four counts arising out of alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et. seq.[2] (Doc. No. 1.) Shortly thereafter, the defendants filed a Motion to Compel Arbitration (Doc. No. 17) based on the LLC Agreement, which sets forth "dispute resolution procedures" applicable to "[a]ny and all controversies, disputes or claims arising out of, relating to, or in connection with this Agreement or any related agreement, document or obligation, including any challenge regarding its or their existence, validity, operation or termination." (Doc. No. 18-1 at 40 & ex. A; Doc. No. 18-2 at 40–41 & ex. A.) The procedures require that, if "good faith negotiations" between the parties fail, then the dispute shall, "unless otherwise agreed by the Parties in writing," "be referred to and finally resolved by arbitration before a panel of three (3) arbitrators." (*Id.* at ex. A.) The contract continues:

> The Parties acknowledge that this Agreement evidences a transaction involving interstate commerce. Notwithstanding anything to the contrary contained herein, including Section 1.1(f) with respect to governing law, any arbitration conducted pursuant to the terms of this Agreement shall be governed by the Federal Arbitration Act (9 U.S.C. §§ 1-16) (as amended, modified or supplemented from time to time, the "FAA"). For avoidance of doubt, any issue concerning the extent

---

[1] The defendants allege that they ended their relationship with Silvernagel after learning that he authored a pseudonymous newsletter that included, among other things, favorable references to the potential execution of various U.S. officials. (*See* Doc. No. 18 at 3.) The defendants argue that these actions fall into the definition of cause for termination in Silvernagel's Employment Agreement, which includes "engaging in conduct that is, in the sole discretion of the Employer, unprofessional, dishonorable, unethical, fraudulent, unlawful, or adverse to the interest, reputation or business of [the] Employer." (Doc. No. 18-3 at 5.)

[2] According to the defendants, this was Silvernagel's second attempt to assert claims arising out of this dispute. They state that he previously filed a Complaint in the Circuit Court for Williamson County, Tennessee, where, "just before a scheduled hearing on [the defendants' state court] motion to compel arbitration, [Silvernagel] non-suited the case . . . ." (Doc. No. 18 at 2 & n.1.)

3

to which any Dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the FAA and resolved by the Panel.

(*Id.*) The LLC Agreement extends the rights created thereunder to "[e]ach Member and the Company." (Doc. No. 18-1 at 39; Doc. No. 18-2 at 39.)

Silvernagel filed a Response in opposition to the Motion to Compel Arbitration. (Doc. No. 25.) He argues that the court should not compel arbitration, because the parties' dispute is not governed by the LLC Agreement, but rather by the following provisions of his employment contract ("Employment Agreement"), which he entered into in 2009, prior to the LLC Agreement:

> Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against either of the parties in the courts of the State of Tennessee, County of Davidson, or, if it has or can acquire jurisdiction, in the United States District Court for the Middle District of Tennessee at Nashville, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein..

(Doc. No. 18-3 at 11.) Silvernagel points out that the LLC Agreement contains a provision acknowledging the general enforceability of rights from prior contracts:

> Remedies. Each Member and the Company shall have all rights and remedies set forth in this Agreement and all rights and remedies which such Person has been granted at any time under any other agreement or contract and all of the rights which such Person has under any law. Any Person having any rights under any provision of this Agreement or any other agreements contemplated hereby shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.

(Doc. No. 18-1 at 39; Doc. No. 18-2 at 39.) The defendants have filed a separate Rule 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint (Doc. No. 31), and Silvernagel has filed

a Motion to Amend Complaint (Doc. No. 36) that seeks to remedy some of the substantive concerns raised by the Rule 12(b)(6) motion.

## II. LEGAL STANDARD

The question of whether Silvernagel's claims must be arbitrated is governed by the Federal Arbitration Act ("FAA"). The FAA provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or in equity for the revocation of any contract." 9 U.S.C. § 2. There is a "strong presumption" in favor of arbitration under the FAA. *Huffman v. Hilltop Companies, LLC*, 747 F.3d 391, 393 (6th Cir. 2014). "[A]ny doubts regarding arbitrability should be resolved in favor of arbitration." *Fazio v. Lehman Bros.*, 340 F.3d 386, 392 (6th Cir. 2003) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)). Where a litigant establishes the existence of a valid agreement to arbitrate the dispute at issue, the court must grant the litigant's motion to compel arbitration and stay or dismiss proceedings until the completion of arbitration. *Glazer v. Lehman Bros., Inc.*, (citing 9 U.S.C. §§ 3–4). The party opposing arbitration has the burden to prove that there is a "genuine issue of material fact as to the validity of the agreement to arbitrate." *Brubaker v. Barrett*, 801 F. Supp. 2d 743, 750 (E.D. Tenn. 2011) (quoting *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002)).

## III. ANALYSIS

"[O]nce a motion to compel arbitration is filed, 'the district court [must] refrain from further action'" until that request is resolved. *Southard v. Newcomb Oil Co., LLC*, No. 19-5187, 2019 WL 8111958, at *4 (6th Cir. Nov. 12, 2019) (quoting *Midwest Mech. Contractors, Inc. v. Commonwealth Const. Co.*, 801 F.2d 748, 750 (5th Cir. 1986)). Otherwise, the court would risk deciding issues that should properly be reserved for the arbitrator or arbitral panel. Accordingly,

5

while the defendants' arguments in favor of dismissal on the merits may raise persuasive arguments, the court cannot address those arguments before first resolving whether the defendants are entitled to have the dispute referred to arbitration. That issue, in this instance, can be analyzed in terms of two questions. First, does the LLC Agreement contain a valid and enforceable arbitration clause? And, second, does this dispute fall within the scope of that clause?[3]

## A. Validity and Enforceability of the Arbitration Clause

A court considering whether to enforce an arbitration agreement must first determine whether such an agreement actually exists. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). In doing so, the court applies the applicable state law pertaining to contract formation. *De Angelis v. Icon Entm't Grp. Inc.*, 364 F. Supp. 3d 787, 792 (S.D. Ohio 2019) (citations omitted). If the court finds that such an agreement was actually formed, the party opposing arbitration may also put forth "generally applicable state-law contract defenses" to the validity or enforceability of the contract, including, but not limited to, such defenses as "fraud, forgery, duress, mistake, lack of consideration or mutual obligation, or unconscionability." *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th Cir. 2004). The court must address those defenses, "absent a valid provision specifically committing such disputes"—sometimes referred to as involving "threshold" issues of arbitrability—"to an arbitrator." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010).

This particular agreement *does* have a provision seemingly dedicating at least some threshold issues of arbitrability to the arbitrator (or, in this instance, the arbitral panel). (*See* Doc.

---

[3] Silvernagel also sets forth what he characterizes as a third argument: that he subjectively did not intend to be bound by an arbitration clause. He ultimately acknowledges, however, that such issues are subsumed within the general category of "substantive arbitrability." (Doc. No. 25 at 4–5.)

6

No. 18-1 ex. A; Doc. No. 18-2 ex. A.) The defendants' Motion to Compel and supporting Memorandum, however, do not ask the court to refrain from considering those issues. Rather, while the defendants quote the relevant language alongside other parts of the arbitration provision, they otherwise treat the validity and applicability of that provision as properly before the court. (*See, e.g.,* Doc. No. 18 at 11 ("Because, in this case, the arbitration provision between Plaintiff and PathGroup is governed by the FAA and contains a valid arbitration provision that covers all of the claims in the complaint, this Court must compel arbitration of Plaintiff's claims against Defendants.").) In the defendants' Reply, they do eventually recognize that threshold issues of arbitrability were arguably delegated to arbitration, and they suggest that the court should rule accordingly. (Doc. No. 28 at 2.) The Reply, however, was not the appropriate setting to raise such an argument for the first time.

While delegation of threshold issues to the arbitrator is permissible, whether such a delegation occurred presents a distinct issue, separate from a mere request that the underlying claims themselves be arbitrated. *See Becker v. Delek US Energy, Inc*., 39 F.4th 351, 355 (6th Cir. 2022) ("A delegation provision is 'an [antecedent] agreement to arbitrate threshold issues concerning the arbitration agreement.'") (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010)). Because the pending Motion and its supporting Memorandum do not "ask[] the . . . court to enforce a delegation provision so that the very issue of arbitrability is compelled to an arbitrator," *id.*, the court will treat the issues of the validity and scope of the arbitration provision as properly before the court.[4] (Doc. No. 18 at 11.)

Silvernagel's sole argument that the arbitration provision is unenforceable is that it is impermissibly indefinite, because it allows for subsequent modification of arbitration procedures

---

[4] The court notes, however, that it makes no determination regarding the power of an arbitral panel to revisit those issues, if it concludes, pursuant to its own powers and procedures, that it can do so.

7

by the parties. As Silvernagel correctly notes, mutual intent to pursue a course of action does not become a contract until, among other things, the parties actually agree on the material terms. *See Gurley v. King*, 183 S.W.3d 30, 35 (Tenn. Ct. App. 2005) (collecting cases and authorities).[5] Accordingly, an "agreement to agree"—that is, an agreement that does not actually resolve the material details of the relevant matter but merely reflects an ostensible desire to come together at a later date—typically will not result in an enforceable contract. *Four Eights, LLC v. Salem*, 194 S.W.3d 484, 487 (Tenn. Ct. App. 2005) (collecting cases). That does not, however, mean that contracts cannot be drafted to allow for some flexibility or that contracting parties must dictate every aspect of their contemplated relationship ahead of time. All that is required is that "[t]he [material] contract terms . . . be 'sufficiently definite to enable a court to give it an exact meaning.'" *LVH, LLC v. Freeman Inv.*, LLC, No. M2020-00698-COA-R3-CV, 2021 WL 1943370, at *3 (Tenn. Ct. App. May 14, 2021) (quoting *United Am. Bank of Memphis v. Walker*, 1986 WL 11250, at *1 (Tenn. Ct. App. Oct. 10, 1986)).

It is not uncommon for parties to include such permissible flexibility in arbitration clauses. For example, the Sixth Circuit has held that it is permissible under Tennessee law for an arbitration clause to grant one party the unilateral power to amend the relevant procedures "as may be necessary or appropriate to give effect to the intent of [the clause], in light of circumstances which arise after the date" of the contract's original formation. *Howell v. Rivergate Toyota, Inc.*, 144 F. App'x 475, 477 (6th Cir. 2005). In reaching that decision, the court noted that any such amendments would be wholly procedural in nature and would be

---

[5] The LLC Agreement provides that "[t]he law of the state of Delaware shall govern all claims or matters related to or arising from this Agreement . . . ." (Doc. No. 18-1 at 40; Doc. No. 18-2 at 39.) Neither party, however, has argued that the validity of the arbitration clause hinges on any principal peculiar to Delaware. Accordingly, the court will bypass any unnecessary choice-of-law analysis and consider Silvernagel's argument—that the arbitration clause is too indefinite to be enforceable—in light of ordinary principles of contract law applicable in both Delaware and Tennessee.

restricted by the covenant of good faith and fair dealing. *Id.* at 479 (citing *Elliott v. Elliott*, 149 S.W.3d 77, 84–85 (Tenn. Ct. App. 2004)). The court also stressed that, "[b]y signing the arbitration agreement," the plaintiff "acknowledged that he understood and agreed to be bound by the terms of the Procedure, including the provision authorizing [the defendant] to amend those terms as 'necessary or appropriate' to give effect to the parties' intent to arbitrate." *Id.* There was, accordingly, a knowing and mutual assent to a flexible—but sufficiently definite and limited—arbitration framework that the courts were bound to enforce. *Id.*

The arbitration clause in the LLC Agreement is far less open-ended than the unilateral amendment clause that the Sixth Circuit upheld. The only alleged indefiniteness that Silvernagel has cited is the fact that the provision applies, "unless otherwise agreed by the Parties in writing." That, though, is simply an acknowledgment of the ordinary fact that contracts can be amended and rights can be waived or renegotiated. Indeed, such terms are extraordinarily commonplace, and, even if a contract does not expressly acknowledge that it can be amended, the possibility of such amendment is simply a straightforward, unremarkable feature of contract law. *See In re Estate of Nelson*, No. W2006–00030–COA–R3–CV, 2007 WL 851265, at *18 (Tenn. Ct. App. Mar. 22, 2007) ("After a written contract is made, it may be modified by the express words of the parties . . . , where both parties consent to such modifications.") (citing *Lancaster v. Ferrell Paving, Inc.*, 397 S.W.3d 606, 611 (Tenn. Ct. App. 2011)). Silvernagel has identified no basis for treating such a provision as problematic, let alone grounds for disregarding a contractual obligation. The court accordingly must turn to whether the arbitration agreement applies to this lawsuit.

9

**B. Application of the Arbitration Clause to this Suit**

As with the issue of enforceability, the court notes that the language of the arbitration agreement arguably commends this threshold issue to the arbitrator. Again, however, the defendants' initial briefing treated the matter as properly before the court, so the court will consider the issues raised.

The arbitration provision invoked by the defendants, on its face, applies to all "controversies, disputes or claims arising out of, relating to, or in connection with" the LLC Agreement. (Doc. No. 18-1 ex. A; Doc. No. 18-2 ex. A.) The ultimate dispute between these parties involves the appropriate price of "Units" that are being repurchased pursuant to the LLC Agreement's provisions. On its face, such a dispute appears plainly to fall within the scope of that language. *See Clayton v. Davidson Contractors, LLC*, No. E2013-02296-COA-R3-CV, 2015 WL 1880973, at *5 (Tenn. Ct. App. Apr. 24, 2015) (describing an arbitration provision applying to "'any controversy or claim arising out of or relating to' the contract" as "broad"); *Dale Supply Co. v. York Int'l Corp.*, No. M2002-01408-COA-R3CV, 2003 WL 22309461, at *5 (Tenn. Ct. App. Oct. 9, 2003) (describing clause covering "all claims, disputes, and controversies arising out of or relating in any way to the relationship of the parties or this Agreement, or the breach thereof" as "expansive" and covering "all controversies"); *cf. Milton Invs., LLC v. Lockwood Bros., II*, LLC, No. CIV.A. 4909-VCP, 2010 WL 2836404, at *3 (Del. Ch. July 20, 2010) (construing general arbitration clause in LLC agreement as sufficiently "broad in scope" to "effectively allow[] for arbitration of all disputes between the parties").

Silvernagel has nevertheless taken pains, in his Complaint, to try to frame the dispute as involving only the Employment Agreement, not the LLC Agreement. Silvernagel's artful drafting, however, cannot conceal the fact that this case is ultimately about the buyout and, by

10

extension, the LLC Agreement that governs it. Under the Employment Agreement itself, the primary right that hinges on the distinction between for-cause and without-cause termination was Silvernagel's right to 90 days of prior notice. (Doc. No. 18-3 at 3–4.) The alleged harms at the heart of Silvernagel's case, however, have nothing to do with notice. Rather, he argues that the defendants terminated him "in order to convert, extort, and defraud him of his interest in [PathGroup] at a reduced price prior to an impending sale of" the company. (Doc. No. 26 ¶ 19.) He complains that being terminated for cause "would result in millions of dollars in loss to him," due to his loss of the "fair market value or deal value of his ownership interests." (*Id.* ¶¶ 20, 26.) Those alleged injuries arise directly out of the LLC Agreement. True, they also implicate the Employment Agreement, but that is entirely because the LLC Agreement itself incorporates a definition from the Employment Agreement. The actual rights, interests, and harms at issue are all products of the LLC Agreement.

Silvernagel attempts to create ambiguity and contradiction within the LLC Agreement itself by contrasting its arbitration provisions with its general terms preserving rights from previous contracts. It is not clear to the court that there is, in fact, any contradiction between those terms—let alone one that would have any relevance to this case. The most natural reading of all the language at issue is that, when a dispute is over substantive rights arising out of the LLC Agreement, then that dispute should be arbitrated, whereas disputes solely about the preexisting Employment Agreement arguably should not. Even if there is some slight ambiguity regarding how to reconcile the two agreements, then that ambiguity would pose an issue only in marginal cases—for example, employment disputes that "relate" or "connect" to the LLC Agreement only incidentally. The rights and issues raised by this matter, however, are squarely within the core considerations of the LLC Agreement. It would be a strange reading of the LLC

Agreement to conclude that, although it broadly and clearly requires the arbitration of disputes, it does not require the arbitration of the most significant type of dispute that could foreseeably arise—an irreconcilable conflict between Management Investors resulting in one Management Investor's being forced out.

Even if the relevant language could be twisted to be potentially compatible with such a reading, moreover, the defendants' interpretation would prevail for multiple reasons. First, the federal courts have interpreted the FAA to require that "[a]ny ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration." *Stout*, 228 F.3d at 714. Second, under "well-settled" principles of contractl interpretation, "'particular and specific provisions of a contract prevail over general provisions.'" *Lamar Advert. Co. v. By-Pass Partners*, 313 S.W.3d 779, 794 (Tenn. Ct. App. 2009) (quoting *Precision Mech. Contractors v. Metro. Dev. & Hous. Agency*, No. M2000–02117–COA–R3–CV, 2001 WL 1285900, at *5 (Tenn. Ct. App. Oct. 25, 2001)). The specific dedication of disputes to arbitration would prevail over the general provision preserving rights from prior contracts. Finally, for the reasons that the court has already discussed, a finding of arbitrability is simply more compatible with the language and purpose of the LLC Agreement—even if one ignores the FAA and any specific rules of interpretation favoring the defendants' position.

The defendants are therefore entitled to have these claims referred to arbitration. The FAA instructs that, "upon being satisfied that the issue involved in [a] suit or proceeding is referable to arbitration," the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. Silvernagel, however, has made no request that the matter be stayed, and the

defendants have asked that it be dismissed.[6] Under the law of this circuit, a dismissal of claims without prejudice is permitted in connection with referral to arbitration in such a situation. *Hilton v. Midland Funding, LLC*, 687 F. App'x 515, 519 (6th Cir. 2017). The court, seeing no equitable or practical reason to retain jurisdiction over the case, will dismiss Silvernagel's claims without prejudice.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Compel Arbitration and to Dismiss, or in the Alternative, to Stay Proceedings (Doc. No. 17) will be granted, and the case will be dismissed. The following motions will therefore be denied without prejudice as moot: the defendants' Motion to Dismiss Plaintiff's First Amended Complaint (Doc. No. 31); Silvernagel's Motion to Amend Complaint (Doc. No. 36); and Silvernagel's Unopposed Motion for Leave to file Excess Pages (Doc. No. 37).

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

[6] Silvernagel also has made no request that the court retain jurisdiction so that he can pursue claims against the John Doe defendants, who are discussed only briefly in the Amended Complaint.

13